**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIAN BENO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. Action No. 16-1128** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **MURRAY AMERICAN RIVER** | ) | |
| **TOWING, INC., UNITED STATES,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

**OPINION**

CONTI, Chief District Judge

### I. Introduction

Pending before the court in this case filed under the Jones Act ("Jones Act"), 46 U.S.C. § 30104, are a motion for reconsideration (ECF No. 36) and a motion for leave to file a third amended complaint (ECF No. 45) filed by plaintiff Brian Beno ("plaintiff"). Plaintiff seeks to hold defendant Murray American River Towing, Inc. ("MARTI") vicariously liable for the actions of the Army Corps of Engineers ("ACE"), which is an agent of defendant United States of America ("United States").[1] Plaintiff, however, did not present to the court—either in the first amended complaint or in a proposed third amended complaint—factual allegations that plausibly show that MARTI is vicariously liable for the alleged negligent actions of the United States, i.e., a third party that was not acting as MARTI's agent at the time of plaintiff's alleged injury. Under those circumstances, plaintiff is not entitled to reconsideration of this court's decision to dismiss

---

[1] Plaintiff in the first amended complaint alleges that ACE acted "on behalf of the United States." (ECF No. 15 ¶ 3.) The parties at this stage of the litigation do not dispute that at all relevant times ACE acted as an agent of the United States. The court in this opinion will refer to the actions of ACE as the actions of the United States for ease of reference.

from the first amended complaint plaintiff's vicarious liability claim asserted against MARTI based upon the allegedly negligent acts of the United States. Permitting plaintiff to file the proposed third amended complaint with respect to that vicarious liability claim would be futile. For those reasons, which are fully explained in this opinion, plaintiff's motion for reconsideration (ECF No. 36) and motion for leave to file a third amended complaint (ECF No. 45) will be denied.

## II. <u>Procedural History</u>

On July 27, 2016, plaintiff initiated this action by filing a complaint against MARTI and the United States. (ECF No. 1.) Plaintiff in the complaint asserted claims against MARTI under the Jones Act for direct and vicarious negligence, and general maritime law for unseaworthiness, maintenance and cure. (<u>Id.</u>) Plaintiff in the complaint asserted a claim against the United States for non-discretionary negligence under the Suits in Admiralty Act, 46 U.S.C. §§ 741-752. (Id. ¶ 3, 6.)

On September 27, 2016, MARTI filed a motion to dismiss along with a brief in support of the motion. (ECF Nos. 12, 13.) On October 3, 2016, the United States filed an answer to the complaint. (ECF No. 14.) On that same date, plaintiff filed a first amended complaint against defendants asserting claims under the Jones Act for direct and vicarious negligence, and general maritime law for maintenance and cure, and a claim against the United States for non-discretionary negligence under the Suits in Admiralty Act. (ECF No. 15.) On October 4, 2016, this court denied as moot the motion to dismiss. (ECF No. 17.)

On October 24, 2016, MARTI filed a motion to dismiss the first amended complaint along with a brief in support of the motion. (ECF Nos. 19, 20.) On that same date, the United States filed an answer to the amended complaint. (ECF No. 21.) On October 31, 2016, plaintiff

filed a response in opposition to the motion to dismiss along with a brief in support of the motion. (ECF Nos. 26, 27.)

On December 9, 2016, the court held a hearing with respect to the motion to dismiss the first amended complaint. The court:

- recognized that plaintiff's claims for the maintenance and cure remained in the case and were not impacted by the motion to dismiss (Hearing Transcript ("H.T.") 12/9/2016 (ECF No. 57) at 5);

- granted the motion to dismiss without prejudice with respect to the direct negligence claims because the allegations in the first amended complaint were conclusory with respect to whether MARTI knew or should have known about "Mad Mike's" dangerous propensities (id. at 13-14); and

- granted the motion to dismiss with respect to the negligence claim based upon MARTI's vicarious liability for the actions of the United States because the first amended complaint did not contain any factual allegations sufficient to plausibly show that MARTI controlled the activities relevant to plaintiff's claims (id.).

The court explained with respect to the negligence claim asserted against MARTI based upon its alleged vicarious liability for the acts of the United States that "absent some type of showing of control or ability to control that there couldn't be vicarious liability under the operational test." (Id. at 13.) The court permitted plaintiff to file a second amended complaint on or before December 30, 2016. (Id. at 14.)

On December 27, 2016, plaintiff filed a motion for reconsideration of the court's order granting in part the motion to dismiss the first amended complaint and a brief in support of the motion. (ECF Nos. 36, 37.) On the same day, plaintiff filed a second amended complaint. (ECF No. 38.) Plaintiff in the second amended complaint sets forth two counts: (1) against MARTI for "direct and vicarious negligence, the latter being based on the operational activity doctrine, and general maritime law for maintenance and cure;" and (2) against the United States under the Suits in Admiralty Act for "non-discretionary negligence of Mad Mike." (ECF No. 38.)

On January 9, 2017, the United States filed an answer. (ECF No. 40.) On the same day, the parties filed a joint stipulation, which provided:

> WHEREBY the Minute Entry of the Court entered on December 9, 2016, stated that the Court dismissed Plaintiff's vicarious liability claim against MARTI with prejudice and that Plaintiff was given leave to file a Second Amended Complaint regarding the direct negligence claim against MARTI by December 30, 2016, and that the Second Amended Complaint filed by Plaintiff alleges the dismissed vicarious liability claim against MARTI, the parties hereby stipulate that the vicarious liability claim shall be considered dismissed with prejudice pending the resolution of Plaintiff's Motion for Reconsideration of Order Granting Motion to Dismiss With Respect to Vicarious Negligence Claim.

(ECF No. 41.) On January 10, 2017, MARTI filed an answer and a crossclaim against the United States. (ECF No. 42.)

On January 17, 2017, MARTI filed a response in opposition to plaintiff's motion for reconsideration. (ECF No. 44.) On January 31, 2017, plaintiff filed a motion for leave to file a third amended complaint and a brief in support of the motion. (ECF Nos. 45, 46.) On February 28, 2017, MARTI filed a response in opposition to plaintiff's motion for leave to file a third amended complaint. (ECF No. 53.) On March 13, 2017, the United States filed an answer to MARTI's crossclaim. (ECF No. 55.)

On April 4, 2017, the court held a hearing on the motion for reconsideration and motion for leave to file a third amended complaint. The court recognized the general rule under federal common law that an employer, i.e., MARTI, cannot be held liable to its employee, i.e., plaintiff, for the tortious conduct of a third party, i.e., the United States, that is not the employer's agent. The court explained, however, that under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60, an employer may be held liable to its employee for the conduct of a third party if: (1) the third party performed the operational activities of the employer; and (2) the employer and third party had a contractual agreement. The court's preliminary assessment was that—even

4

if plaintiff could plausibly show that the United States performed the operational activities of MARTI—plaintiff did not set forth factual allegations sufficient to plausibly show that MARTI *contracted* with the United States for the United States to perform those activities or that MARTI exercised control over the United States. Plaintiff argued that a contract was not required for MARTI to be held vicariously liable for the tortious conduct of the United States because the United States owed an implied duty of workmanlike service to MARTI. The court permitted the parties to submit supplemental briefing to address that issue, among others.

On April 25, 2017, plaintiff filed its supplemental brief and attached to its brief the "affidavit declaration of Dennis M. O'Bryan." (ECF No. 59.) On May 9, 2017, MARTI filed its response to plaintiff's supplemental brief. (ECF No. 60.) On May 10, 2017, the United States filed its supplemental brief and attached eight exhibits. (ECF No. 61.) On July 12, 2017, the parties were provided an opportunity to present argument about the motions pending before the court.

The motion for reconsideration and motion for leave to file a third amended complaint are now fully briefed and argued and are ripe for disposition.

**III.** <u>**Motion for Reconsideration**</u> **(ECF No. 36)**

    **A. Standard of Review**

        **1. Motion for reconsideration, Federal Rule of Civil Procedure 54(b)**

"Normally, motions for reconsideration are decided under Federal Rules of Civil Procedure 59(e) or 60(b)." <u>In re Nat'l Forge Co.</u>, 326 B.R. 532, 541 (W.D. Pa. 2005). Those rules do not apply to plaintiff's motion for reconsideration, however, because plaintiff is seeking

reconsideration of an interlocutory ruling, rather than a final judgment or order.[2] Id.  "It is well-established that the appropriate Rule under which to file motions for reconsideration of an interlocutory order is Rule 54(b)." Cezair v. JP Morgan Chase Bank N.A., Civ. Action No. 13-2928, 2014 WL 4955535, at *1 (D.Md. Sept. 30, 2014); see Qazizadeh v. Pinnacle Health Sys., 214 F.Supp.3d 292, 298 (M.D. Pa. 2016) ("[M]otions for reconsideration of interlocutory orders—whether denials of summary judgment, grants of partial summary judgment, or any other non-final orders—are motions under Federal Rule of Civil Procedure 54(b)."). Federal Rule of Civil Procedure 54(b) provides, in pertinent part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b).

A motion for reconsideration with respect to a *final* order or judgment must rely on one of three grounds: (1) an intervening change in the law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995). "'While the standards articulated in Rule[ ] ... 60(b) are not binding in an analysis of Rule 54(b) motions, courts frequently look to

---

[2]     The court's order granting MARTI's motion to dismiss with respect to the vicarious liability claim was not a *final* order because it did not end the action as to any of the claims or parties and the court did not otherwise direct entry of final judgment. FED. R. CIV. P. 54(b). The court: (1) granted the motion to dismiss without prejudice with respect to the direct negligence claim asserted against MARTI and permitted plaintiff to amend the complaint with respect to that claim; (2) granted the motion to dismiss without prejudice with respect to the vicarious negligence claim asserted against MARTI and permitted plaintiff to file a motion for reconsideration with respect to that claim.; and (3) denied the motion to dismiss with respect to the claims for maintenance and cure. (H.T. 12/9/2016 (ECF No. 57).)

these standards for guidance in considering such motions.'" Ampro Computers, Inc. v. LXE, LLC, Civ. Action No. 2016 WL 3703129, at *2 (D.Del. July 8, 2016) (quoting Cezair, 2014 WL 4955535, at *1).[3] Reconsideration of interlocutory orders, however, "may be had even if the movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issued the underlying order, or the 'need to correct a clear error of law or fact or to prevent manifest injustice.'" Qazizadeh, 214 F.Supp.3d at 298 (quoting Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)). "[T]he court may permit reconsideration whenever 'consonant with justice to do so.'" Qazizadeh, 214 F.Supp.3d at 298 (quoting St. Mary's Area Water Auth. v. St. Paul Fire and Marine Ins. Co., 472 F.Supp.2d 630, 632 (M.D. Pa. 2007)); United States v. Jerry, 487 F.2d 600, 604 (3d Cir. 1973) ("'[I]f an interlocutory decree be involved, a rehearing may be sought at any time before final decree, provided due diligence be employed and a revision be otherwise consonant with equity.'") (quoting John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 90-91 (1922)).

While "district courts have more discretion in reconsidering interlocutory orders than in revising final judgments," Foster v. Westchester Fire Ins. Co., Civ. Action No. 09-1459, 2012 WL 2402895, at *4 (W.D. Pa. June 26, 2012), the Third Circuit Court of Appeals has held that "[t]he trial court must, of course, exercise this authority in a responsible way, both procedurally and substantively," and that "[e]ffective trial court management requires a presumption against reconsideration of interlocutory decisions." In re Anthanassious, 418 F. App'x 91, 96 (3d Cir. 2011). Thus, courts should exercise this inherent power with a "light hand." Foster, 2012 WL

---

[3]     "An alleged clear error of fact, which meets the stringent requirements for reconsideration of final orders…logically meets the lesser threshold for reconsideration of interlocutory orders." Qazizadeh v. Pinnacle Health Sys., 214 F.Supp.3d 292, 298 (M.D. Pa. 2016).

2402895, at *4 n.1. In discussing the scope of a district court's discretion to reconsider an interlocutory decision, the Third Circuit Court of Appeals has held that while " '[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.' " In re Pharmacy Benefit Managers, 582 F.3d 432, 439 (3d Cir. 2009) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)).

### 2. Motion to dismiss, Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(Id.) (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

The Court of Appeals for the Third Circuit has instructed that "a court reviewing the sufficiency of a complaint must take three steps." Connelly v. Lane Constr. Corp., 809 F.3d 780, 876-87 (3d Cir. 2016). The court of appeals explained:

First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Iqbal, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."Id. at 679. See also Burch v. Milberg Factors, Inc., 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."(citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

Id. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)).

## B. Factual allegations in the first amended complaint

Plaintiff was an employee of MARTI as a crewmember aboard its vessel The M/V BRIAN MURRAY (the "ship"). (ECF No. 15 ¶ 2.) All acts giving rise to this lawsuit occurred in the course of plaintiff's employment while the ship was passing through the Montgomery Lock & Dam on the Ohio River (the "lock"). (Id.)

On or about October 10, 2015, the ship proceeded through the lock, which was operated by ACE on behalf of the United States. ACE was employed to operate the lock by the United States. (ECF No. 15 ¶ 5.) A cut of barges was pulled out of the lock at an excessive speed by

lockman "Mad Mike" via a lock tractor at an excessive rate of speed. (<u>Id</u>.) Plaintiff injured his arm when he tried to bring the cut to a stop. (<u>Id</u>.) According to plaintiff, MARTI "knew or should have known of [Mad Mike's] said propensity for negligently excessive speed but failed to protest said misconduct allowing said practice to persist unabated." (<u>Id</u>. ¶ 5.) Plaintiff alleges that he suffered damages as a result of the negligence of MARTI and the United States. (<u>Id</u>.)

### C. Analysis

#### 1. The <u>Sinkler/Hopson</u> doctrine

Plaintiff filed his negligence claim against MARTI under the Jones Act, which incorporates the standards of the FELA. Under the FELA and the Jones Act, an employer is "liable for the injuries negligently inflicted on its employees by its 'officers, agents, or employees.'" <u>Hopson v. Texaco, Inc.</u>, 383 U.S. 262, 263 (1966) (quoting 45 U.S.C. § 51). The FELA, and, therefore, the Jones Act, "'is founded on commonlaw concepts of negligence and injury.'" <u>Montgomery v. CSX Transp., Inc.</u>, Civ. Action No. 14-1520, 2017 WL 219369, at *6 (D.Md. Jan. 19, 2017) (quoting <u>Urie v. Thompson</u>, 337 U.S. 163, 182 (1949)). Courts apply common law agency principles to cases arising under the FELA. <u>Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.</u>, 15 F.Supp.2d 740, 751 (E.D. Pa. 1998) (citing <u>Kelley v. S. Pac. Co.</u>, 419 U.S. 318, 324 (1974)).

"The Restatement (Second) of Agency is the appropriate place to find the federal common law definition" of agency. <u>Steinberg v. Mikkelsen</u>, 901 F.Supp. 1433, 1437 (E.D. Wis. 1995) (citing <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 740 (1989) (citing to the Restatement (Second) of Agency to define "scope of employment"); <u>Taylor v. Peoples Nat. Gas Co.</u>, 49 F.3d 982, 989 (3d Cir. 1995) (citing to the Restatement (Second) of Agency to define "apparent authority")); <u>see</u> <u>Everett v. United Omaha Life Ins. Co.</u>, Civ. Action No. 11-0926,

2013 WL 5570222, at *8 (M.D. Pa. Oct. 9, 2013) ("The Restatement (Second) of Agency provides the federal common law definition of agency."). The Restatement (Second) of Agency § 1 provides, in pertinent part:

> Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

RESTATEMENT (SECOND) OF AGENCY § 1. The Restatement (Second) of Agency defines "independent contractor" as follows:

> a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

RESTATEMENT (SECOND) OF AGENCY § 2.

Under the federal common law, an employer who—under lawful contract—hired an independent contractor to perform operations on its behalf could not be held liable to a third party for the negligence of the independent contractor. Sinkler v. Missouri Pacific R.R. Co., 356 U.S. 326, 328 (1958) (explaining that the court of appeals "applied the general rule that the doctrine of respondent superior does not extend to independent contractors and concluded that, since the evidence was insufficient to show that the respondent exercised control over the details of the Belt Railway's operations, the fault of its switching crew was not imputable to the respondent."); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 462 (5th ed. 2011) (noting that under the standard of negligence set forth in the FELA, "negligence of an independent contractor is not chargeable to the employer. Nevertheless, if the independent contractor performs operational activities or was engaged as the agent of the employer, the employer may be liable for his negligence.").

The Supreme Court of the United States in <u>Sinkler</u>,[4] however, explained that the FELA was "an avowed departure from the rules of the common law," which recognized "the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety[.]" <u>Id.</u> at 762. The Court explained that "[t]he cost of human injury, an inescapable expense of railroading, must be borne by someone, and the FELA seeks to adjust that expense equitably between the worker and the carrier." <u>Id.</u> The Court held that—under those circumstances—"when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of s 1 of FELA." <u>Id.</u> at 763. In other

---

[4]     In <u>Sinkler</u>, an employee of the Missouri Pacific Railroad Company (the "railroad") was injured by the negligence of a third party hired by the railroad to perform "switching" for the railroad. The railroad owned half the stock and designated one-half of the directors for the third party. <u>Sinkler</u>, 356 U.S. at 762. The Supreme Court held that the railroad could be held liable to its employee for the negligence of the third party and explained:

> In the present case the respondent, rather than doing the necessary switching incident to its business in the Houston Terminal area, arranged that the Belt Railway should supply the crews and equipment to perform this operation on its behalf. But the evidence clearly establishes that the respondent's trains, when under the control of the Belt Railway's switching crews, were being handled to further the task of the respondent's enterprise. While engaged in switching and handling respondent's cars and trains about the terminal area, the Belt Railway employees on the job were, for purposes of the FELA, as much a part of the respondent's total enterprise as was the petitioner while engaged in his regular work on the respondent's car.

> It is manifest that the corporate autonomy of the Belt Railway, and its freedom from detailed supervision of its operations by respondent, are irrelevant inasmuch as the switching crew of the Belt Railway Company at the moment of the collision in the station was engaged in furthering the operational activities of respondent. We therefore hold that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of s 1 of FELA.

<u>Sinkler</u>, 356 U.S. at 762-63.

words, the Court expanded the meaning of "agent" under the FELA beyond the common law meaning to include situations where an independent contractor—under a contract with an employer—performs an operational activity of the employer.

In <u>Hopson v. Texaco, Inc.</u>, 383 U.S. 262 (1966), the Supreme Court applied the Court's holding in <u>Sinkler</u> to a negligence claim brought under the Jones Act. In <u>Hopson</u>:

> [T]wo seamen became ill in Trinidad and were unable to continue the voyage. In order to comply with the statutory requirement that incapacitated seamen be brought before a United States Consul before discharge in a foreign port the ship's Master procured a cab for the trip. En route a collision occurred as a result of the negligence of the taxi driver, killing one seaman and seriously injuring the other.

<u>Tim v. Am. President Lines, Limited</u>, 409 F.2d 385, 388 (9th Cir. 1969) (citing <u>Hopson</u>, 383 U.S. at 263). The Court acknowledged that the high level of risk inherent to railroading exists when one's work is at sea, and, therefore, held that when a seaman's "'injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of'" the Jones Act. <u>Id.</u> at 264. The Court explained:

> These seamen were in the service of the ship and the ill-fated journey to Port of Spain was a vital part of the ship's total operations. The ship could not sail with these two men, nor could it lawfully discharge them without taking them to the United States Consul. Indeed, to have abandoned them would have breached the statutory duty to arrange for their return to the United States. Getting these two ill seamen to the United States Consul's office was, therefore, the duty of respondent. And it was respondent—not the seamen—which selected, as it had done many times before, the taxi service. Respondent—the law says—should bear the responsibility for the negligence of the driver which it chose. This is so because, as we said in <u>Sinkler</u>, 'justice demands that one who gives his labor to the furtherance of the enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered.' 356 U.S., at 330, 78 S.Ct. at 762.

<u>Id.</u> at 264.

Following Sinkler and Hopson, courts appear to engage in a two-step analysis to determine whether an employee may sue his or her employer for the negligent acts of a third party under the Jones Act, i.e., whether the third party was an agent of the employer. First, the courts apply the Sinkler/Hopson test and consider whether: (1) the third party performed the operational activities of the employer; and (2) whether the employer and third party had a contractual agreement. If a court determines that the facts of a case failed to satisfy the Sinkler/Hopson test, the court then analyzes whether—under federal common law—the third party is the employer's agent by analyzing whether the employer had the ability to control the third party or had actual control over the third party.

For example, in Tim v. American President Lines, Ltd., 409 F.2d 385 (9th Cir. 1969), the district court first considered whether the employer and third party were engaged in a contract. Having found that they "had no oral or written contract," the court then considered whether the whether the employer had "any ownership [of] or other financial interest"[5] in the third party. Id.

---

[5]    The court in Tim appeared to be analyzing whether the third party was the agent of the employer by analyzing whether the employer had the *ability to control* the employer. "'It is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal has the right to control the conduct of the agent with respect to matters entrusted to him.'" N.L.R.B. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 19, 154 F.3d 137, 142-43 (3d Cir. 1998) (quoting Int'l Longshoremen's Ass'n, AFL-CIO v. N.L.R.B., 56 F.3d 205, 213 (D.C. Cir. 1995). The Third Circuit Court of Appeals has explained:

> Agency law recognizes the principal's *ability to control* and monitor agent behavior and generally makes the principal liable for those acts performed by its agent in the scope of his employment. See Restatement (Second) of Agency §§ 2, 25, 219 (1958).

Menichini v. Grant, 995 F.2d 1224, 1233 (3d Cir. 1993) (emphasis added) (explaining "[f]or their part, principals can minimize agency costs not only by measuring or observing the behavior of the agent but also by controlling the agent's behavior through operating rules, compensation policies, budget restrictions and the like"); Advest, Inc. v. Wagner, Civ. Action No. 03-1372,

at 388. The district court determined the employer did not have any ownership of or other financial interest in the third party, and concluded the third party was not the agent of the employer under the Jones Act. Id. The Court of Appeals for the Ninth Circuit agreed with the decision of the district court. Id.

In Craig v. Atlantic Richfield Co., 19 F.3d 472 (9th Cir. 1994), the district court first considered whether there was a contract entered into between the employer and allegedly negligent third party. The district court noted that the plaintiff "could only establish that [the

---

2005 WL 2456228, at *6 (W.D. Pa. Sept. 27, 2005) (finding an agency relationship between two entities "founded on the supervision and control that Advest exerts over "Nussbaum Partners" and the manifestations of both parties to consent to that supervision and control, as evidenced by the paying of compensation and benefits, supervision of activities and accounts, and shared letterhead, office space, and telephone listing of "Nussbaum Partners" with Advest"); Merritt v. Med. Disability Ins. Plan, Civ. Action No. 96-4495, 1998 WL 1110694, at *7 (D.N.J. Aug. 28, 1998) ("In the absence of such control, I find that Defendants were not agents of IBM.").

The court in Japan Petroleum Co. v. Ashland Oil, Inc., 456 F.Supp. 831 (D. Del. 1978), explained:

> Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact.17 See, Pacific Can Co., supra, 95 F.2d at 46; Eastern Industries v. Traffic Controls, 142 F.Supp. 381, 384 (D.Del.1956). The central factual issue is control, I. e., whether the parent corporation dominates the activities of the subsidiary. See, Pacific Can Co., supra at 45-46. See also, Restatement (Second) of Agency s 1; Seavey, supra s 1 at 3-5.

> In order to determine whether or not a sufficient degree of control exists to establish an agency relationship, the Court must look to a wide variety of factors, such as stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets. See, e. g., The list of factors contained in Fish v. East, 114 F.2d 177, 191 (10th Cir. 1940).

Japan Petroleum, 456 F.Supp. at 840-41 (deciding the issue based upon "the general principles of corporate and agency law").

third party was the employer's] 'agent' by presenting evidence that [the employer] exercised a sufficient amount of control over [the third party]." <u>Id.</u> at 478. The Court of Appeals for the Ninth Circuit approved the analysis undertaken by the district court and explained:

> Neither Brinkerhoff nor Crowley had a contractual relationship with Airfast, they did not select Airfast to transport their employees, and they had no ownership or other financial interest in Airfast. The district court considered one additional factor—whether Brinkerhoff or Crowley had "actual control" over Airfast. It properly concluded that neither Brinkerhoff nor Crowley had actual control over Airfast's flight plans. Airfast was not the "agent" of Brinkerhoff or Crowley.

<u>Id.</u>

Similarly in <u>Kenny v. BNSF Railway Co.</u>, Civ. Action No. 11-624, 2012 WL 2390004 (W.D. Wash. 2012), the court first considered whether the employer and allegedly negligent third party had a contractual agreement. The court then considered whether the employer had a financial or other interest in the third party. Lastly, the court considered whether the employer exercised "actual control" over the third party. The court—deciding a motion for summary judgment—held that there were material disputes of fact with respect to whether the employer exercised control over the third party and denied the motion for summary judgment. The court explained:

> Genuine issues of material fact exist as to the level of control BNSF exerted over CUSA, such as the extent to which BSNF dictated the scheduling and other details of employee transportation. Because unresolved factual questions preclude the Court from holding CUSA is BNSF's agent as a matter of law, and because Plaintiff has not asserted any evidence of direct negligence on the part of BNSF's officers or other employees, the Court must deny the motion for summary judgment as to BNSF's liability.

<u>Kenny</u>, 2012 WL 2390004, at *4.

Some courts applying the <u>Sinkler/Hopson</u> doctrine have held that the test for agency under FELA is "contract centric" and decline to find agency if the employer and third party are

not engaged in a contractual agreement. See e.g., Hamilton v. Marine Carriers Corp., 332 F.Supp. 223, 227 (E.D. Pa. 1971) ("[I]t should be understood that a contractual relationship must exist between the owner or his agent and the negligent party to establish liability under the Jones Act."); Waldsachs v. Inland Marine Serv., Civ. Action No. 10-05, 2011 WL 4744671, at*3 (W.D. Ky. Oct. 7, 2011) ("[C]ourts reviewing agency principals under FELA tend to focus on the contractual relationship between the vessel owner and the agent."). An agency relationship for purpose of the FELA, however, does not appear to be limited to the situation described by the Court in Sinkler and Hopson, i.e., a situation in which the third party is under contract with the employer to perform the operational activities of the employer; rather, an agency relationship under FELA also includes situations in which the employer had the ability to control or actually controlled the acts of the third party. See Tim, 409 F.2d at 388; Craig, 19 F.3d at 478; Kenny, 2012 WL 2390004, at *4. The court—to determine whether the allegedly negligent third party was the agent of the defendant-employer—should, therefore, analyze: (1) whether the Sinkler/Hopson doctrine applies; and (2) whether the employer had the ability to control or actually controlled the acts of the third party.

### 2. The court's ruling on December 9, 2016

The court at the hearing on December 9, 2016, considered whether the Sinkler/Hopson doctrine applied in this case, i.e., whether MARTI and ACE had a contractual agreement pursuant to which ACE performed the operational activities of MARTI. The parties acknowledged that MARTI and ACE were not engaged in a contractual agreement. (H.T. 12/9/2016 (ECF No. 57) at 13.) The court analyzed whether there was some other basis to establish that ACE acted as an agent of MARTI. The court concluded that the factual allegations in the complaint were not sufficient to plausibly show that MARTI had the ability to control

17

ACE or actually controlled ACE in the operation of the lock. The court held that—under those circumstances—there was no plausible claim under which MARTI could be held liable for the allegedly negligent acts of ACE that caused injury to plaintiff.

### 3. The parties' arguments

Plaintiff in his motion for reconsideration argues this court committed a clear error of law when it dismissed plaintiff's negligence claim against MARTI based upon MARTI's vicarious liability for the acts of the United States under the operational activity doctrine. Plaintiff concedes that the factual allegations in the amended complaint do not plausibly show that MARTI controlled the activities of the United States or that MARTI and the United States had a contractual agreement. Plaintiff agrees with MARTI and the United States that the Sinkler/Hopson two-part test applies in this case to determine whether MARTI may be held vicariously liable to plaintiff for the allegedly negligent conduct of the United States.

Plaintiff argues that MARTI may be held vicariously liable for the negligent conduct of the United States because the United States owed to MARTI a warranty of workmanlike service, which may arise in the absence of a contract. In other words, plaintiff argues that the warranty of workmanlike service satisfies the contractual element of the Sinkler/Hopson two-part test. (ECF No. 59 at 1 (citing Waterman Steamship Corp. v. Dugan and McNamara, Inc., 364 U.S. 421 (1960).)

MARTI and the United States oppose plaintiff's motion for reconsideration and argue that this court on December 9, 2016, and again at the hearing on April 4, 2017, correctly held that the factual allegations in the first amended complaint do not plausibly show that MARTI is vicariously liable for the allegedly negligent actions of the United States. MARTI argues that "[w]hether or not [the United States] owed MARTI a warranty of workmanlike service is

18

irrelevant and has no bearing on the application of the operational activity doctrine." (ECF No. 60 at 2.) The United States agrees with MARTI and argues, among other things, that the warranty of workmanlike service "is now largely defunct and, even in its heyday, never gave an injured worker a new or separate cause of action for his injury." (ECF No. 61 at 13.)

For the reasons set forth below, this court did not commit a clear error of law when it dismissed the vicarious negligence claim from the first amended complaint. Plaintiff did not satisfy his burden to show that the United States acted as an agent of MARTI.

### 4. Warranty of workmanlike service

The warranty of workmanlike service, otherwise known as "Ryan indemnity," originated from two decisions by the Supreme Court of the United States: Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85 (1946), and Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124 (1956). Sieracki and Ryan arose under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905. In each of those cases, a longshoreman sued, among others, the owner of the ship on which he was injured based upon the shipowner's breach of the duty of seaworthiness. According to the longshoreman in each case, the shipowner breached the duty of seaworthiness by maintaining an unsafe condition by which he was injured. Sieracki, 328 U.S. at 87; Ryan, 350 U.S. at 127.

In Sieracki, the Court held that the shipowner's warranty of seaworthiness, which traditionally extended only to seamen, extended to longshoreman, and, therefore, the longshoreman could maintain a lawsuit against the shipowner. Sieracki, 328 U.S. at 97. In Ryan, the Supreme Court held that where the unsafe condition that injured the longshoreman was caused by the stevedore that employed him and was under contract with the shipowner, the negligent stevedore was required to indemnify the innocent shipowner for its liability to the

injured longshoreman. This indemnity is referred to as "Ryan indemnity." Cooper v. Loper, 923 F.2d 1045, 1051 (3d Cir. 1991).

"The rationale for this implied indemnity arises from the fact that a stevedoring company that takes control of a ship to load or unload it is more capable than the shipowner of avoiding accidents during the course of that operation." Operadora Maritima de Graneles, S.A. v. Gamesa Wind U.S., LLC, 989 F.Supp.2d 445, 459 (E.D. Pa. 2013) (citing In re Air Crash Near Peggy's Cove, Civ. Action No. 99-5998, 2004 WL 2468263, at *9 (E.D. Pa. Nov. 2, 2004)). Ryan indemnity provided a right to the shipowner to recoup monies paid to a longshoreman injured by an unsafe condition within the control of a third party, i.e., the stevedoring company. In Weyerhaeuser S.S. Co. v. Nacirema Co., 355 U.S. 563 (1958), the Court extended Ryan indemnity to the "use of equipment incidental to cargo handling." Waterman, 364 U.S. at 422 (citing Weyerhaeuser S.S. Co. v. Nacirema Co., 355 U.S. 563 (1958)). The Court has explained that "[t]he warranty may be breached when the stevedore's negligence does no more than call into play the vessel's unseaworthiness." Waterman, 364 U.S. at 422 (citing Crumady v. The J.H. Fisser, 358 U.S. 423, 429 (1959)).

In Edmonds v. Compagnie Generale Translatlantique, 443 U.S. 256 (1979), the Supreme Court held that 1972 amendments to the LHWCA overruled Ryan and "prevent[ed] the vessel from recouping from the stevedore any of the damages that the longshoreman may recover from the vessel." Edmonds, 443 U.S. at 264-65. Although Ryan indemnity is no longer applicable under the LHWCA, the doctrine is applied in admiralty cases filed by employees who are not covered by the LHWCA, e.g., seamen like plaintiff in this case. In re Complaint of J.A.R. Barge Lines L.P., 373 F. App'x 265, 267 (3d Cir. 2010) (recognizing that "[l]ong after the 1972 amendments," the court of appeals "applied Ryan in a case concerning injuries to a seaman,

making clear that <u>Ryan</u> is still binding within this Circuit in the seaman context.") (citing <u>Cooper v. Loper</u>, 923 F.2d 1045, 1050-51 (3d Cir. 1991)); <u>Purnell v. Norned Shipping B. V.</u>, 801 F.2d 152, 154 n.1 (3d Cir. 1986) ("the 1972 amendments do not limit <u>Ryan's</u> applicability to employees, like plaintiffs' decedents, who are not covered by that Act.)).

The Court of Appeals for the Second Circuit has explained that <u>Ryan</u> indemnity applies when

> a shipowner,…relying on the expertise of another party (the contractor),…**enters into a contract whereby the contractor agrees to perform services without supervision or control by the shipowner**; the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault.

<u>Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.</u>, 511 F.2d 1252, 1258 (2d Cir. 1975) (emphasis added). The court in <u>Fairmont</u> explained that when the foregoing elements are satisfied, "there will be implied **in the contract** an agreement by the contractor to indemnify the shipowner for any liability it might incur as a result of an unseaworthy condition caused or brought into play by the improper, unsafe or incompetent performance of the contractor." <u>Id.</u> (emphasis added). This court followed <u>Fairmont</u> and applied <u>Ryan</u> indemnity in an admiralty case. <u>In re Complaint of J.A.R. Barge Lines, L.P.</u>, Civ. Action No. 2005 WL 2465893, at *3-5 (W.D. Pa. Oct. 5, 2005). The Third Circuit Court of Appeals "affirm[ed] the District Court's application of <u>Ryan</u>" in that decision. <u>In Re Complaint of J.A.R. Barge Lines L.P.</u>, 373 F. App'x at 268. The Third Circuit Court of Appeals in <u>Hurst v. Triad Shipping Co.</u>, 554 F.2d 1237 (3d Cir. 1977), cited to <u>Fairmont's</u> "thorough discussion of the development of the warranty of workmanlike performance." <u>Hurst</u>, 554 F.2d at 1234 n.10.

Other district courts within the Third Circuit have analyzed claims of <u>Ryan</u> indemnity under the parameters set forth by the Second Circuit Court of Appeals in <u>Fairmont</u>. <u>Operadora Maritima de Graneles, S.A. v. Garnesa Wind U.S., LLC</u>, 989 F.Supp.2d 445, 45 (E.D. Pa. 2013); <u>In re McAllister Towing and Transp. Co., Inc.</u>, Civ. Action No. 2004 WL 2009330, at *7 (E.D. Pa. Sept. 9, 2004) ("The <u>Fairmont</u> court explained…the elements for the warranty" of workmanlike service" and noting "the <u>Fairmont</u> elements are cited in virtually every case analyzing the application of the warranty."); <u>Somarelf v. Am. Bureau of Shippin</u>, 704 F.Supp. 59, 62 (D.N.J. 1988).

Here, plaintiff argues that "there is no need for a contract between [the United States] and MARTI in order for a warranty of workmanlike service to exist." (ECF No. 59 at 1 (citing <u>Waterman Steamship Corp. v. Dugan and McNamara, Inc.</u>, 364 U.S. 421 (1960); <u>Williams v. Ocean Transport Lines, Inc.</u>, 425 F.2d 1183 (3d Cir. 1970)). Plaintiff's reliance upon <u>Waterman</u> and <u>Williams</u>, however, is misplaced because those decisions are not as expansive as plaintiff contends.

In <u>Waterman</u>, "a longshoreman employed by the respondent was injured aboard" a ship owned by the petitioner "while engaged with other employees of the respondent in unloading the ship." <u>Waterman</u>, 364 U.S. at 421-22. The Court described the cause of the longshoreman's injuries as follows: "The cargo consisted of bagged sugar. The longshoreman was working in the hold, and his injuries resulted from the collapse of a vertical column of hundred-pound bags which the unloading operations had left without lateral support." <u>Id.</u> at 422. The longshoreman sued the petitioner-shipowner to recover for his injuries. <u>Id.</u> The petitioner-shipowner settled the lawsuit with the longshoreman and "by way of a third-party complaint, sought to recover from the respondent the amount paid in satisfaction of the longshoreman's claim." <u>Id.</u> The respondent-

stevedore argued that it was not required to indemnify the petitioner-shipowner because there was no direct contractual relationship between the respondent-stevedore and the petitioner-shipowner. Id. The parties at trial stipulated that they did not have a contractual agreement with respect to "the stevedoring services rendered" by the respondent-stevedore on the petitioner-shipowner's vessel. Id. The consignee of the cargo, however, "engaged" the respondent-stevedore to unload the ship of the cargo. Id. The district court "directed a verdict for the respondent, holding that a shipowner has no right of indemnity against a stevedore under the circumstances alleged in the absence of a direct contractual relationship between them." Id. at 422-23. The Third Circuit Court of Appeals affirmed the decision of the district court in an *en banc* decision. Id. at 423.

The Supreme Court reversed the decision of the Court of Appeals for the Third Circuit, and explained:

> In the Ryan and Weyerhaeuser cases considerable emphasis was placed upon the direct contractual relationship between the shipowner and the stevedore. If those decisions stood alone, it might well be thought an open question whether such contractual privity is essential to support the stevedore's duty to indemnify. But the fact is that this bridge was crossed in the Crumady case. There we explicitly held that the stevedore's assumption of responsibility for the shipowner's damages resulting from unsafe and improper performance of the stevedoring services was unaffected by the fact that the shipowner was not the party who had hired the stevedore. That case was decided upon the factual premises that the stevedore had been engaged not by the shipowner, but by the party operating the ship under a charter.

Waterman, 364 U.S. at 423. The Court in support of its holding quoted the following passage from the Crumady case:

> We think this case is governed by the principle announced in the Ryan case. The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. **That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries**. Restatement,

Law of Contracts, s 133. Moreover, as we said in the Ryan case, 'competency and safety of stowage are inescapable elements of the service undertaken.' 350 U.S. at page 133, 76 S.Ct. at page 237. They are part of the stevedore's 'warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product.' Id., 350 U.S. at pages 133—134, 76 S.Ct. at page 237. See MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696.

We conclude that since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over.

Crumady, 358 U.S. at 448 (emphasis added). The Court applied the foregoing rationale from

Crumady to Waterman and explained:

We can perceive no difference in principle, so far as the stevedore's duty to indemnify the shipowner is concerned, whether the stevedore is engaged by an operator to whom the owner has chartered the vessel or by the consignee of the cargo. Nor can there be any significant distinction in this respect whether the longshoreman's original claim was asserted in an in rem or an in personam proceeding. In the Ryan and Weyerhaeuser cases in personam liability was asserted. In the Crumady case the injured stevedore had brought an in rem proceeding. **The ship and its owner are equally liable for a breach by _the contractor_ of the owner's nondelegable duty to provide a seaworthy vessel.** The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760; cf. Continental Grain Co. v. Barge FBL—585, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540. **The owner, no less than the ship, is the _beneficiary_ of the stevedore's warranty of workmanlike service.**

Waterman, 364 U.S. at 424-25 (emphasis added). The Court on that basis reversed the decision

of the Court of Appeals for the Third Circuit and remanded the case to the district court for

further proceedings. Id. at 425.

The Third Circuit Court of Appeals in Williams v. Ocean Transport Lines, Inc., 425 F.2d

1183, 1186 (3d Cir. 1970), cited Waterman in support of the proposition that the right of

indemnification "does not depend upon any privity of contract between the shipowner and the

warrantor of workmanlike service." Williams, 425 F.2d at 1186. In Williams, the South Jersey

Port Commission ("Port Commission") contracted with T. Hogan Corporation ("Hogan") to

provide stevedoring services at its port. Id. at 1185. The plaintiff in that case was injured aboard the S.S. John Wilson ("John Wilson") when a "shore-based movable crane," owned by the Port Commission and operated by Hogan, failed. Id. The plaintiff filed two lawsuits relating to his injuries: (1) a lawsuit against the owner of the John Wilson for "failing to provide a safe place to work;" and (2) a lawsuit against the Port Commission for negligence with respect to the crane. Id. The owner of the vessel "filed a third party complaint against Hogan and the Port Commission alleging breach by each third party defendant of its contract to furnish stevedoring services in a safe and workmanlike manner." Id. The insurance carrier of the Port Commission determined that it owed a duty to indemnify the vessel owner and, therefore, "wound up defending" both the Port Commission and vessel owner against the plaintiff's lawsuits. Id. The Third Circuit Court of Appeals held with respect to the "indemnity issue:"

> The insurer defending the Port Commission concluded correctly that the Port Commission owed a duty to indemnify the vessel and its owner, Ocean Transport. There was no dispute that use of the Port Commission's defective crane was relied upon as creating the condition of unseaworthiness. The Port Commission, therefore, owed Ocean Transport a clear duty to indemnify against Williams' unseaworthiness claim. It acknowledged that duty in writing and undertook the defense of the action on Ocean Transport's behalf.

Id. The Third Circuit Court of Appeals in Williams recognized that the owner of the John Wilson was a third-party beneficiary to the contract between the Port Commission and Hogan. Id. Under those circumstances, the owner of the John Wilson was entitled to indemnity from the Port Commission based upon a breach of the warranty of workmanlike service. Id.

As discussed above, Waterman and Williams do not stand for the proposition that the warranty of workmanlike service may exist without a contract. In those decisions, although the shipowners and stevedores were not contractually bound, the shipowners were third-party beneficiaries to contracts for services performed by the stevedores on or about the shipowners'

25

vessels. The shipowners, therefore, were entitled to indemnity as third-party beneficiaries to those contracts based upon breaches of the warranty of workmanlike service, which was implied in each of those contracts.

Plaintiff also cites to <u>Oglebay Norton Co. v. CSX Corp.</u>, 788 F.2d 361 (6th Cir. 1986), in support of his argument that the United States owed to MARTI the warranty of workmanlike service despite there being no applicable contract in this case. (ECF No. 26.) In <u>Oglebay Norton</u>, the plaintiff-vessel sued the defendant-dock for <u>Ryan</u> indemnity. The plaintiff-shipowner settled a wrongful death claim brought by the personal representative of a seaman who was injured while working on the plaintiff's vessel and defendant's dock. The court did not discuss whether a contract existed between the plaintiff-shipowner and defendant-dock or whether the plaintiff-shipowner was a third-party beneficiary to a contract of the defendant-dock. The court—in a footnote—explained that although <u>Ryan</u> involved parties to a contract, "[a] contractual relationship….is not considered an essential element to imply [the warranty of workmanlike service]." <u>Id.</u> (citing <u>Waterman</u>, 364 U.S. 421).

If the Sixth Circuit Court of Appeals in <u>Oglebay-Norton</u> intended to cite <u>Waterman</u> for the proposition that the warranty of workmanlike service may exist between two parties without the creation of *any* contract, its reading of that decision is too broad. The Third Circuit Court of Appeals has recognized that the application of <u>Ryan</u> indemnity in <u>Crumady</u> and <u>Waterman</u> was based upon the shipowner being a third-party beneficiary to a contractual agreement giving rise to the warranty of workmanlike service. <u>In re Frescati Shipping Co., Ltd.</u>, 718 F.3d 184, 198 (3d Cir. 2013). The Third Circuit Court of Appeals explained:

> In 1959, the Supreme Court held that vessels are automatic third-party beneficiaries of warranties of workmanlike service made to their charterers by stevedores who unload vessels at docks. <u>Crumady v. The Joachim Hendrik Fisser</u>,

358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). This is because "[t]he warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not." Id. This natural relationship between the entities was "enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries." Id. (citation omitted). A year later, the Supreme Court extended this rule a logical step further in holding that "[t]he owner, no less than the ship, is the beneficiary of the stevedore's warranty of workmanlike service." Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 425, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960).

Id. Under those circumstances, the court is not convinced by plaintiff's citation to Oglebay; rather, this court must follow the interpretation of Waterman set forth by the Third Circuit Court of Appeals in Frescati, which requires—at the very least—that a shipowner be a third-party beneficiary of a contract giving rise to the warranty of workmanlike service for Ryan indemnity to apply.

Plaintiff in the first amended complaint did not set forth factual allegations to plausibly show a contract existed between MARTI and the United States, *or* that the United States entered into a contract with another entity for services performed on or about MARTI's vessel to which MARTI was a third-party beneficiary. The court cannot, therefore, conclude that there is a plausible claim that the United States owed to MARTI a warranty of workmanlike service. The court next must determine whether the expanded definition of agency can apply in a case when the pertinent parties were not contractually bound or third-party beneficiaries of a contract.

### 5. Application of the Sinkler/Hopson doctrine

As explained above, the Sinkler/Hopson doctrine is applicable if: (1) the third party performed the operational activities of the employer; and (2) the employer and third party had a contractual agreement. It follows that if a shipowner is not engaged in a contractual relationship with the third party performing its operational activities, the Sinkler/Hopson doctrine, i.e., the

expanded view of common law agency, does not apply to that case. The shipowner, however, may be held vicariously liable to the injured seaman for the negligent acts of the third party under traditional notions of agency.

The court did not find any authority suggesting that the Sinkler/Hopson doctrine may be applicable in a case where there is no actual or implied contract to which a defendant is a party or third-party beneficiary. Plaintiff argues that this court should follow the decision of the Third Circuit Court of Appeals in Carney v. Pittsburgh and Lake Erie Railroad Company, 316 F.2d 277 (3d Cir. 1963), and apply the Sinkler/Hopson doctrine to this case despite there being no contractual agreement between MARTI and the United States.

The Court of Appeals for the Third Circuit described the facts in Carney as follows:

> Plaintiff, a communications lineman, was assigned with his gang to work on a project at defendant's year [sic] near Youngtown, Ohio. Since he lived and had his headquarters in Pittsburgh, defendant had the option under its contract of transferring plaintiff to Youngstown and requiring him to pay his own expenses there or it could leave his headquarters in Pittsburgh and pay his expenses at Youngstown. Defendant chose the latter course and arranged for plaintiff and his gang to stay at the 'railroad 'Y'' at Campbell. Plaintiff lived there during the week, eating two meals a day at its restaurant and taking out a lunch supplied by the 'Y'. He went home to Pittsburgh on weekends. This routine was followed for several months prior to May 3, 1957, the date of the accident.
> …
> Plaintiff's expenses at the Y.M.C.A. were billed directly to defendant and paid on a monthly basis. There was conflicting testimony as to whether plaintiff, in the period prior to his accident, was free to live in other accommodations having rates similar to those of the 'Y' and be reimbursed therefor by the railroad. Apparently at oral argument before the district court on its motion for judgment n.o.v. defendant conceded that it would not have paid or reimbursed plaintiff for his living expenses unless he stayed at the 'Y'. In any event, we have the essential common elements of Mostyn and Casso in that defendant provided plaintiff with shelter and food, which by custom and the economic realities of the situation he and his work group were encouraged to use. The case clearly comes within the framework of Mostyn and is in harmony with those decisions which have found related activities to be 'necessarily incident' to one's employment.

Carney, 316 F.2d at 278. The court of appeals in Carney noted that the employer railroad had "some measure of control" over the Y.M.C.A., but based its decision "primarily upon the proposition that plaintiff's residence and lodging at the Y.M.C.A. was part of the operational activities of the railroad." Id.

Plaintiff in his motion for leave to file a third amended complaint argues that there was no contract in Carney, yet the court of appeals applied the expanded definition of agency in that case. The court of appeals in that case, however, noted that the employer-railroad and the Y.M.C.A. had an "arrangement" pursuant to which the employer-railroad paid all the plaintiff's Y.M.C.A. expenses, which were billed directly to the employer-railroad and paid on a monthly basis. The court of appeals also quoted the holding of Sinkler, which provides that "'when a railroad employee's injury is caused in whole or in part by the fault of others performing, **under contract**, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA.'" Carney, 316 F.2d at 280 (quoting Sinkler, 356 U.S. at 331-32 (emphasis added)). The court of appeals explained that the present case was "nearly on all fours" with Mostyn v. Delaware, 160 F.2d 15 (2d Cir. 1947), in which the allegedly negligent third party was "under contract" with the employer-railroad to provide room and board to the employer-railroad's employees. Carney, 316 F.2d at 278. Based upon the foregoing, plaintiff's argument that there was no contract in Carney is unavailing.

As discussed above, plaintiff in the first amended complaint did not set forth factual allegations sufficient to plausibly show that MARTI and the United States had a contractual relationship based upon an actual contract or MARTI being the third-party beneficiary of a contract giving rise to the warranty of workmanlike service. Plaintiff did not, therefore, satisfy one of the two mandatory elements of the Sinkler/Hopson two-part test, i.e., the existence of a

contractual relationship. Based upon the factual allegations in the first amended complaint, even under the expanded definition of agency, the United States was not the agent of MARTI at the time plaintiff was injured, and, therefore, MARTI cannot be held vicariously liable for the actions of the United States. Under those circumstances, the court did not commit a clear error of law that warrants reconsideration when it dismissed from the first amended complaint the vicarious negligence claim asserted against MARTI. Plaintiff's motion for reconsideration will be denied.

### 6. Operational activities

Having determined that plaintiff did not set forth factual allegations to plausibly show that MARTI and the United States had a contractual relationship or an agency relationship, it is not necessary for the court to analyze whether plaintiff set forth factual allegations sufficient to plausibly show that the United States performed the operational activities of MARTI when plaintiff was allegedly injured.

### D. Conclusion

The court applied the correct law to the issues raised by the motion to dismiss the first amended complaint and correctly analyzed the factual allegations contained therein. Plaintiff did not provide a proper basis upon which this court should reconsider its decision dismissing plaintiff's vicarious negligence claim asserted against MARTI based upon the alleged negligence of the United States. The motion for reconsideration (ECF No. 36) will, therefore, be denied.

## IV. <u>Motion for Leave to File a Third Amended Complaint</u> (ECF No. 45)

### A. Standard of Review

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint should be "freely give[n]…when justice so requires." FED. R. CIV. P. 15(a)(2). "Among the grounds that

could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). An amendment is futile when it would not cure the deficiency in the complaint, or, in other words, when the complaint, as amended, would still fail to state a claim upon which relief could be granted. Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (citing In re Burlington, 114 F.3d at 1434). "In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." Shane, 213 F.3d at 116. In other words, "if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency." Id. at 115.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550

U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(<u>Id.</u>) (quoting <u>Twombly</u>, 550 U.S. at 556) (internal citations omitted).

The Court of Appeals for the Third Circuit has instructed that "a court reviewing the

sufficiency of a complaint must take three steps." <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780,

876-87 (3d Cir. 2016). The court of appeals explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." <u>Iqbal</u>, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."<u>Id.</u> at 679. <u>See also</u> <u>Burtch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."(citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 679.

<u>Id.</u> "Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007)).

### B. The parties' arguments

Plaintiff seeks leave to file a third amended complaint[6] containing factual allegations

about whether MARTI controlled the operations of the United States at the lock where he was

---

[6]     At the hearing on December 9, 2017, the court instructed that plaintiff had until December 30, 2016, to file a *second* amended complaint. Plaintiff filed a second amended complaint on that date, but did not insert additional allegations about MARTI controlling the operations of ACE. Plaintiff in his brief in support of the motion for leave to file a third amended

allegedly injured. (ECF No. 46.) Plaintiff seeks to add the following paragraph to the second amended complaint:

> 5. On or about October 16, 2015, Plaintiff was proceeding through the Montgomery Lock & Dam on the Ohio River which was being operated by ACE - employed by United States- who is vicariously liable for ACE's negligence, as is Defendant MARTI because MARTI exercised operational control over whether or not ACE would pull a cut of barges out of the lock, insofar as Defendant MARTI, requested, arranged for, and gave authorization to ACE to pull MARTI's cut of barges out of ACE's lock as opposed to MARTI doing it itself. The cut of barges were negligently pulled out of the lock by ACE's lockman via a lock tractor at an excessive rate of speed and when Plaintiff tried to bring the cut to a stop his arm was injured because of said excessive rate of speed occasioned by ACE's lockman, all the while MARTI was directly/actively negligent insofar as (a) communication between the deckhands - pilot house - lockmaster was not adequately maintained throughout the entire locking process because of inadequate, unseaworthy procedures and/or radios not working properly, thusly, the lockman could not, or otherwise negligently was not, told by the captain to slow down, and (b) an unseaworthy failure to have proper line handling procedures in effect to prevent such occurrences such as negligently, not using a lite check line to slow down the cut before stopping, all of which constitutes negligence, unseaworthiness and/or a failure to provide a safe place to work.

(ECF No. 46 at 2-3.) Plaintiff also seeks to add a footnote in the third amended complaint that provides "MARTI paid to the United States a fuel tax for the United States providing the services of ACE." (Id. at 2.) Plaintiff argues that the foregoing allegations are sufficient to plausibly show that the United States was the agent of MARTI, and, therefore, MARTI may be held liable for ACE's allegedly negligent acts that harmed plaintiff. (ECF No. 46 at 3-4.) Plaintiff argues for a

---

complaint (ECF No. 46) asserts that he did not provide those additional allegations in the second amended complaint because the deposition of the lockman that he believed would provide that information did and could not take place until January 26, 2017.

On January 31, 2017, plaintiff filed a motion for leave to file the third amended complaint. Plaintiff did not file a copy of the proposed third amended complaint; rather, he asserts in his brief in support of the motion for leave to file a proposed third amended complaint that he seeks to add one paragraph to the second amended complaint. He provides the full text of that new paragraph in his brief in support of the motion. (ECF No. 46 at 2-3.) The text of that paragraph is set forth in this opinion.

"flexible" approach with respect to the contractual requirement of the <u>Sinkler/Hopson</u> doctrine and that the court focus on the control MARTI had over the United States.

MARTI argues plaintiff's proposed amendment does not contain factual allegations sufficient to plausibly show that it exercised sufficient control over the United States to be held liable for plaintiff's injuries. (ECF No. 53 at 1.)

### C. Analysis

The court—to determine whether filing the third amended complaint would be futile—must analyze the factual allegations in the proposed third amended complaint to determine whether they are sufficient to plausibly show that the United States acted as MARTI's agent.

As discussed above, agency can be shown in a case arising under the Jones Act if one party had the ability to control or exercised sufficient control over another party or the <u>Sinkler/Hopson</u> two-part test is satisfied. Plaintiff in this case conflates these two methods of proving agency. Plaintiff argues that—in light of the control MARTI exercised over the United States—the court should apply a *flexible* approach with respect to the contractual requirement of the <u>Sinkler</u>/<u>Hopson</u> doctrine.[7] (ECF No. 46 at 2-3 (citing <u>Carney v. Pittsburgh and Lake Erie Railroad Co.</u>, 316 F2d 277, 279-80 (3d Cir. 1963).) If, however, MARTI exercised sufficient control over the United States such that the United States was MARTI's agent, the contractual requirement of the <u>Sinkler/Hopson</u> doctrine would be moot. Whether—based upon the allegations in the proposed third amended complaint—MARTI had the ability to control or

---

[7]     Plaintiff also argues that the court should take into consideration that the United States may be able to defeat plaintiff's claims based upon the negligence of the United States because of sovereign immunity. The court declines to consider that argument because the United States' defenses are not properly before the court at this stage of the litigation

exercised actual control over the United States or the <u>Sinkler/Hopson</u> doctrine applies to this case will be addressed below.

### 1. Ability to Control or Actual Control

Here, the only factual allegations in the proposed third amended complaint about control are: "MARTI exercised operation control over whether or not ACE would pull a cut of barges out of the lock, insofar as Defendant MARTI, requested, arranged for, and gave authorization to ACE to pull MARTI's cut of barges out of ACE's lock as opposed to MARTI doing it itself." (ECF No. 46 at 2.) Those allegations, however, are not sufficient to plausibly show that MARTI had the ability control or actually controlled the operations of the United States. The allegations are conclusory. When the United States is not an independent contractor of a shipowner, the court cannot conclude that is it plausible that the shipowner had the authority to tell or could tell the United States how to operate the lock. As MARTI points out, simply using the lock is not the same as having control over ACE's operation of the lock. (ECF No. 53 at 5.) Plaintiff set forth factual allegations to plausibly show that MARTI used the lock but not that it had the ability to or actually controlled the United States' operation of it.

There are no factual allegations to plausibly show that the United States was the agent of MARTI or that MARTI could control whether the United States operated the lock or how the United States operated the lock. Plaintiff in the proposed third amended complaint alleges:

> The cut of barges were negligently pulled out of the lock by ACE's lockman <u>via</u> a lock tractor at an excessive rate of speed and when Plaintiff tried to bring the cut to a stop his arm was injured because of said excessive rate of speed occasioned by ACE's lockman[.]

(ECF No. 46 at 2-3.) Plaintiff sets forth factual allegations with respect to MARTI's direct liability for his injuries. The proposed third amended complaint, however, does not set forth

factual allegations sufficient to plausibly show that MARTI had the ability to control or actual control over the United States, i.e., the United States was an agent of MARTI.[8]

## 2. **Sinkler/Hopson** Doctrine

Plaintiff does not propose to include additional factual allegations in the third amended complaint—which are not set forth in the first amended complaint—that plausibly show MARTI and the United States were contractually bound. The court's analysis with respect to plaintiff's motion for reconsideration and the <u>Sinkler/Hopson</u> doctrine is, therefore, equally applicable to the proposed third amended complaint. For the reasons discussed above, the factual allegations in the proposed third amended complaint are not sufficient to plausibly show that MARTI and the United States had a contractual agreement or that MARTI was a third-party beneficiary to any contract entered into by the United States. The <u>Sinkler/Hopson</u> doctrine, therefore, does not

---

[8] A decision from the Ninth Circuit Court of Appeals provides support for this position. In <u>Tim v. American President Lines, LTD.</u>, 409 F.2d 385 (9th Cir. 1969),

> [the plaintiff] sustained serious personal injuries while employed by American President Lines and acting in the course of his employment as chief electrician aboard the S.S. President Tyler. At the time of the accident cargo at the No. 4 hatch of the ship was being worked by employees of Matson Terminals, Inc., a stevedore company employed by the United States Government to handle the Government's cargo.

<u>Tim</u>, 409 F.2d at 386. The court of appeals in <u>Tim</u> held that the employer-defendant could not be held liable for the alleged negligence of Matson because the employer-defendant "did not select Matson…to load or unload the cargo…, had no oral or written contract with Matson…to do so and was not shown to have any ownership or other financial interest in Matson." <u>Tim</u>, 409 F.2d 388.

This case is similar to <u>Tim</u> because in both instances, the United States—and not the employer-defendant—hired and selected the allegedly negligent party. In <u>Tim</u>, the United States hired Matson Terminals, Inc. to work the hatch of the employer-defendant's vessel. In this case, the United States, through its agent, ACE, hired "Mad Mike" to operate the lock at which plaintiff was allegedly injured. Plaintiff alleges that MARTI could have pulled its cut of barges out of the lock and that it gave ACE permission to pull its cut of barges out of the lock. Those allegations are not sufficient to plausibly show that ACE was the agent of MARTI.

apply to this case. Plaintiff's motion for leave to file the proposed third amended complaint will, therefore, be denied.[9]

## V. Conclusion

The court did not commit a clear error of law when it granted MARTI's motion to dismiss plaintiff's claim of negligence based upon the actions of the United States, and plaintiff did not present any other basis upon which this court should reconsider that decision. The motion for reconsideration (ECF No. 36) will, therefore, be denied.

Plaintiff did not set forth factual allegations sufficient in the proposed third amended complaint to plausibly implicate the <u>Sinkler/Hopson</u> doctrine or show that ACE was an agent of MARTI when ACE allegedly acted in a negligent manner and injured plaintiff. Plaintiff's motion for leave to file a third amended complaint (ECF No. 45) will, therefore, be denied.

An appropriate order will be entered.

BY THE COURT,

Dated: August 3, 2017

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

---

[9] MARTI quotes excerpts from the deposition of Jacob Chiappetta, a lockman, in its brief in opposition to plaintiff's motion for leave to file a third amended complaint. (ECF No. 53 at 5-6.) The court did not give any consideration or weight to that material, which is arguably extraneous to the pleadings.